[Cite as *Presper v. Hurst*, 2020-Ohio-256.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

THOMAS M. PRESPER

     Appellant

     v.

JESSE HURST

     Appellee

C.A. No.     29307

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2017-11-4855

DECISION AND JOURNAL ENTRY

Dated: January 29, 2020

SCHAFER, Judge.

{¶1} Plaintiff-Appellant, Thomas M. Presper, appeals the judgment of the Summit County Court of Common Pleas granting summary judgment on his claims against Defendant-Appellee, Jesse Hurst. This Court reverses and remands the matter to the trial court for further proceedings consistent with this decision.

I.

{¶2} This appeal stems from a dispute over an agreement to terminate the fifty-fifty partnership between Presper and Hurst in a business called Millennial Group, LLC.

{¶3} Millennial Group was a financial services firm originally started in 1997 with Hurst as a founding member. As of 2002, Millennial Group consisted of two members: Hurst and his fifty percent partner, Kenneth Wilhelm. In March 2002, Millennial Group entered a lease with Canal Place, LTD., for office space at Canal Place in Akron, Ohio. Hurst and Wilhelm executed the lease on behalf of Millennial Group as tenant, occupying Suite 2552.

Additionally, Hurst and Wilhelm each executed a personal guaranty on the lease. Shortly thereafter, Presper joined Millennial Group as Wilhelm's successor. Upon Wilhelm's assignment of his membership interest, Presper became a fifty percent member of Millennial Group along with Hurst.

{¶4} Millennial Group executed an amendment in May 2013 to its existing lease, which had previously been amended at least twice. This amendment, captioned "third amendment to lease," extended the lease term through August 31, 2020. Hurst and Presper signed this lease amendment on behalf of Millennial Group, and also signed in their personal capacities as guarantors on the lease.

{¶5} At some point in 2016, Hurst and Presper acknowledged that certain issues had begun to affect their partnership. The two agreed to work out their differences and, for a time, committed to keep Millennial Group together. However, by the end of that year, the parties agreed to end the partnership, dissolve Millennial Group, and for each to form his own independent firm. Hurst proposed that he would relocate his team to a building he owned in Cuyahoga Falls and operate as a new firm called Impel Wealth Management, LLC. However, there remained an issue regarding the obligation of Millennial Group, and the personal guaranties of Presper and Hurst, on the current lease, which was not set to expire until August 31, 2020.

{¶6} Presper and Hurst agreed to a resolution of the lease issue, along with other aspects of their separation, through a termination agreement with an "effective date" of June 12, 2017. The termination agreement stated a dissolution date of June 30, 2017, whereupon the operating agreement of Millennial Group would terminate and the members would be required to effectuate the winding down, liquidation, and dissolution of the company. Section 4 of the agreement—which called for Presper to remain in Suite 2552 while Hurst continued to

contribute one half of the monthly rent—is the primary source of the disagreement underlying this litigation.  That provision states as follows:

> 4. **Lease and Premises.** The Parties acknowledge that the Lease expires on August 31, 2020 (the "**Lease Expiration Date**").  Presper, or an entity to be owned by him, will continue to occupy the Premises from and after the Effective Date, and Hurst will continue to pay one-half of the remaining monthly rent due under the Lease until the soonest to occur of (i) Presper or an entity owned or controlled by him no longer occupying the Premises, (ii) a full or partial subletting of the Premises or assignment of the Lease to an entity not owned or controlled by Presper, (iii) termination of the Lease, or (iv) the Lease Expiration Date.  Presper may not cause the Company to extend the term of the Lease.  Hurst will pay his portion of the rent to Presper or Presper's designee before the date each rental installment is due under the Lease, and Presper will pay the total rental installment to the Landlord on or before the due date.  Attached as <u>Exhibit H</u> is the most recent invoice from the Landlord reflecting the present monthly rental installment amount.  The Parties acknowledge that the Landlord currently holds a security deposit from the Company in the amount of $<u>3,285.00</u> (the "**Security Deposit**").  Presper will promptly remit to Hurst one-half of that portion of the Security Deposit returned by the Landlord upon termination or expiration of the Lease.  The Parties acknowledge that the Company is in compliance with the Lease and the Premises is in good condition and repair as of the Effective Date.  From the Effective Date forward, Presper will be responsible for, and will indemnify, defend and hold Hurst harmless from and against, any and all liabilities or damages arising from the use or occupancy of the Premises by the Company, Presper, or an entity owned by Presper, including, but not limited to, liabilities or damages arising from a breach of the Lease, damage or destruction to the Premises, or personal injury or property damage.  Presper shall immediately notify Hurst of any change in the status of the Lease or his possession of the Premises, for example, termination of the Lease, Presper's vacating of the Premises, Presper's subletting of the Premises, or the landlord's service of a notice of default.

(Emphasis sic.)  The "Company" referred to in the termination agreement is Millennial Group, LLC.  The term "Lease" refers to Millennial Group's original March 2002 lease with Canal Place, including the first, second, and third amendments thereto (collectively, the "Millennial Group Lease").

{¶7}  On March 31, 2017, while the parties were still negotiating the terms of their separation and exchanging proposed drafts of a termination agreement, Presper emailed Steve

Stoner, the property manager at Canal Place. In the message, Presper informed Stoner that Hurst had decided to move out and, because the parties were unable to agree on who could keep the Millennial Group name, the name would be "buried" as of June 30, 2017. Presper further informed him that he would remain in Suite 2552, and that he was seeking "an addendum to the lease to change the corporate name only from Millennial Group to Presper Financial Architects, LLC." Presper also indicated that both he and Hurst would remain as personal guarantors on the lease, and that Hurst would still pay half of the rent through the end of the lease in August 2020. He asked Stoner to confirm that there would be no issue with the corporate name change.

{¶8} Stoner emailed Matt Denham of Covington Group—an entity with an ownership interest and management role in Canal Place. Stoner relayed to Denham that the two partners comprising their tenant, Millennial Group, were splitting, and that both Hurst and Presper signed the lease and the personal guarantee. Stoner inquired of Dunham whether it would be possible for Presper and Hurst to change the name on the lease to Presper Financial Architects, LLC "without affecting the terms and obligations of both."

{¶9} On May 3, 2017, Stoner responded to Presper to inform him that his request was "more than just a change in name" and they would need to review financial documents for Presper, personally, as well as his new firm. Stoner indicated that, following review, if all is in order "we will either prepare the necessary documents to assign the lease or produce a new lease agreement under the same terms and conditions as the existing agreement" reflecting Presper's name and the name of his new firm. Additionally, Stoner noted that "[a]s far as we can tell now, it appears [Hurst] will not need to be a signer on the new agreement."

{¶10} Ultimately, Stoner informed Presper that Canal Place had determined that it would not be possible to simply change the name on the lease from Millennial Group to Presper

Financial Architects, and that a new lease would have to be drawn up. On June 30, 2017, Canal Place presented Presper with a lease agreement between Canal Place A, LLC and Presper Financial Architects, LLC. Presper executed this lease agreement (the "Presper Lease") on behalf of his firm and was the sole personal guarantor. Hurst was neither a party to, nor guarantor for, the Presper Lease. The Presper Lease encompassed the terms and obligations of the Millennial Group Lease along with certain modifications to the lease terms.

{¶11} On July 21, 2017, Hurst, through his counsel, sent a letter and a check to Presper. The letter stated:

> Enclosed are the fully executed Termination Agreement and Mr. Hurst's check in the amount of $607.62. The amount of the check represents Mr. Hurst's one-half share of the rent for the months of May and June ($4,686.60), less one-half of the security deposit ($1,642.50) and one-half of the bank account ($2,436.48) that you owe to Mr. Hurst. Because the Millennial Group lease agreement terminated effective June 30, 2017, Mr. Hurst did not contribute to your rent for July and will not be contributing to your rent for any future months, as provided in Section 4 of the Termination Agreement.

Rejecting Hurst's position that he had been relieved of his obligation to pay one half of the rent, Presper demanded that Hurst continue to make payments pursuant to the terms of the termination agreement.

{¶12} On November 20, 2017, Presper filed a complaint against Hurst for breach of contract and for declaratory judgment. Presper alleged that Hurst breached the termination agreement by refusing to perform his obligation to pay one half of the monthly rent. He also sought a judgment declaring that Hurst is obligated to make continuing monthly payments to Presper until August 31, 2020, pursuant to the terms of the termination agreement.

{¶13} Hurst moved for summary judgment arguing that he was not obligated to pay half of the rent under the Presper Lease, and that any obligation to pay rent under the Millennial Group Lease ended when that lease terminated effective June 30, 2017. Alternatively, Hurst

argued that even if the trial court were to construe the Presper Lease and the Millennial Group Lease as one and the same, Hurst's obligation still ended because Presper extended the term of the lease contra to the termination agreement. Presper opposed the motion. On January 10, 2019, the trial court issued an order granting Hurst's motion for summary judgment.

{¶14} Presper timely appealed the trial court's decision, raising a single assignment of error for our review.

II.

**Assignment of Error**

> **The trial court erred to the prejudice of [Presper] by granting [Hurst's] motion for summary judgment and determining, as a matter of law, that pursuant to Section 4, Subparts (iii) and (iv) Hurst was relieved from his contractual obligation to make one-half of rental payments due under the lease agreement between Canal Place A, [LLC] and Presper Financial Architects, LLC.**

{¶15} In his sole assignment of error, Presper argues that the trial court erred in construing the parties' termination agreement, in light of the facts of this case, to reach the conclusion that summary judgment should be granted in favor Hurst.

{¶16} Under Civ.R. 56(C), summary judgment is appropriate when:

> (1) [no] genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a motion for summary judgment, the moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the moving party satisfies this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 293.

{¶17}   Presper's breach of contract and declaratory judgment claims were dependent on a determination that Hurst remained obligated under the termination agreement to pay one half of the remaining monthly rent due under the Lease.   Per the termination agreement, Hurst's obligation would end if Presper, or an entity owned or controlled by him, no longer occupied Suite 2552, if Suite 2552 was sublet or the Millennial Group Lease was assigned to an entity not owned or controlled by Presper, upon termination of the Lease, or upon reaching the expiration date of the lease.   The crux of the parties' dispute was whether, upon the facts of this case, "termination of the Lease" had occurred.   Therefore, it was incumbent upon the trial court to interpret the termination agreement to ascertain the meaning and appropriate application of the disputed term.

{¶18}   The interpretation of written contracts, and the inherent assessment as to whether it contains any ambiguities, is a question of law which this Court reviews de novo.   *Town & Country Co-op, Inc. v. Sabol Farms, Inc.*, 9th Dist. Wayne No. 11CA0014, 2012-Ohio-4874, ¶ 15.   "When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties."   *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 37.   This requires an examination of the contract as a whole, with a presumption that the parties' intent is reflected in the language of the contract.   *Id*.   Additionally, we "look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement" and, if the language of the contract is clear, we "look no further than the writing itself to find the intent of the parties."   *Id*.   Undefined words appearing in an agreement "'will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents' of the agreement."   *Id* at ¶ 38.

{¶19} On the other hand, if language in the agreement is ambiguous or unclear, or when the circumstances surrounding the agreement imply a special meaning of the plain language, extrinsic evidence may be considered to ascertain the intent and objectives of the parties in entering the agreement. *Grubb & Assocs., LPA v. Sandor*, 9th Dist. Summit No. 29089, 2019-Ohio-128, ¶ 9, quoting *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, ¶ 9. "Terms in a contract are ambiguous if their meanings cannot be determined from reading the entire contract, or if they are reasonably susceptible to multiple interpretations." *First Natl. Bank of Pennsylvania v. Nader*, 9th Dist. Medina No. 16CA0004-M, 2017-Ohio-1482, ¶ 25. Where an ambiguity exists, interpretation of a contract requires the trial court to resolve both factual and legal questions, but only if the ambiguity is "'coupled with a material issue of fact'" is summary judgment improper. *Town & Country* at ¶ 15, quoting *Watkins v. Williams*, 9th Dist. Summit No. 22162, 2004-Ohio-7171, ¶ 23.

{¶20} In his motion for summary judgment, Hurst argued that the relevant provisions of the termination agreement are not in dispute: Hurst's obligation to pay half of the monthly rent ended once the Millennial Group Lease "terminated" as stated in Section 4 of the termination agreement. Hurst argued that the plain language of Section 4(iii) included termination of the Millennial Group Lease for any purpose, and that the Millennial Group lease terminated, effective July 30, 2017, once Presper executed the Presper Lease. Because the "rent due under the [Millennial Group] Lease" was now due under the Presper Lease, Hurst asserted that he was relieved of his obligation to continue paying, as agreed, half of the rent Millennial Group owed through August 31, 2020. Hurst argued that "[a]s a matter of Ohio law, a new lease terminates the old lease[,]" citing to the Eight District Court of Appeals decision in *Renaissance Mgt., Inc. v. Jay-Lor Corp.*, 8th Dist. Cuyahoga No. 95585, 2011-Ohio-2792. Hurst's position disregarded

any issues as to whether a change in the form of the obligation—transferring the Millennial Group Lease obligation to a new lease as a result of the dissolution of Millennial Group—was what the parties intended when they included the phrase "termination of the Lease" in the separation agreement. Alternatively, Hurst argued that, even if the Millennial Group Lease and the Presper Lease are construed as one and the same, Hurst's obligation to pay half of the rent ended once Presper caused an extension of the rental period.

{¶21} Presper, in response, asserted that this was not the type of "termination" contemplated by the termination agreement. He argued that Hurst's contention that the Millennial Group Lease obligations terminated under these circumstances was "inconsistent with the clear intent of the parties" and would produce an "absurd" result. Referring to the substance of the termination agreement, Presper noted that both parties acknowledged that Millennial Group would be dissolved and liquidated as of June 30, 2017. Presper indicated that it is also evident, per Section 4 of the termination agreement, the parties contemplated Hurst would continue to pay half of the rent while "Presper, or an entity to be owned by him," would continue to occupy Suite 2552. Presper posited that it is inconceivable the parties could have intended that Presper or his new firm could continue to occupy the space while it remained leased to a dissolved and fully liquidated company. In essence, Presper reads the termination agreement so as to recognize that, inevitably, Presper would have to take some action to assume the Millennial Group Lease obligations once Millennial Group ceased to exist. Thus, he submits that the incorporation of Millennial Group's remaining lease obligation into the Presper Lease is not what the parties contemplated as a "termination" of the Lease, as such an interpretation would render Section 4 of the agreement effectively meaningless.

**{¶22}** Looking to the termination agreement, the trial court found that the language of the agreement "is clear and unambiguous, therefore, it is not necessary to look beyond the written agreement to determine the intent of the parties." It does not appear, however, that the trial court engaged in a review of the language of the termination agreement, as a whole, to ascertain the intent of the parties consistent with the phrase "termination of the Lease[.]" The trial court stated that Hurst's obligation to pay one half of the rent ended upon the termination of the Millennial Group Lease. Rather than confining its review to the "written agreement to determine the intent of the parties" as to what would constitute a termination of the lease, the trial court accepted Hurst's argument that case law supplied the definition: a new lease terminates an old lease as a matter of law.

**{¶23}** Applying *Renaissance*, the trial court stated that "[t]he general rule is that an agreement to make a new lease between the landlord and a lessee's assignee extinguishes the liability of the lessee/assignor." *Renaissance*, 2011-Ohio-2792 at ¶ 26. The trial court then considered differences between the Millennial Group Lease and the Presper Lease. Based on these differences, the trial court concluded that the Presper Lease was a "new" lease and, therefore, served to terminate the Millennial Group Lease. The trial court held that, because the Millennial Group Lease was terminated, Hurst was no longer required to pay half of the remaining rent due under the termination agreement, and granted summary judgment.

**{¶24}** On appeal, Presper acknowledges that he was forced to execute a new lease as a consequence of the dissolution of Millennial Group. However, he has consistently maintained that the Presper Lease was a continuation of the obligations created under the Millennial Group Lease. Essentially, he argues that the obligations of the Millennial Group Lease were assumed,

not *terminated*, by the Presper Lease. To view it otherwise, Presper contends, "would be inconsistent with the clear intent of the parties[.]"

{¶25} In response, Hurst argues that the parties "assumed that the Millennial Group Lease and their personal guaranties would remain in place despite the termination of their business relationship[,]" and that once the Millennial Group Lease and his personal guaranty ended "for any reason," Hurst "had no intention of paying half Mr. Presper's rent." Insofar as Hurst claims that these views represent the "intent" of the parties, he has not demonstrated where such intent is reflected in the written termination agreement. Without regard to whether such an interpretation is consistent with intent underlying the termination agreement, Hurst maintains that the Millennial Group Lease terminated, and so too did his obligation to pay half of the rent, as a matter of law, upon the execution of the Presper Lease.

{¶26} Upon review, we conclude that, contrary to the trial court's finding, *Renaissance* does not support Hurst's proposition that, regardless of circumstances, a new lease terminates an old lease as a matter of law. This Court's review of that case leads us to conclude that it is inapposite to the present matter. Although *Renaissance* does address the issue of an original tenant's liability where an old lease is surrendered to a new lease and lessee, it does so in the context of determining the original tenant's liability to the *landlord* for default on *the lease*.

{¶27} In *Renaissance* a landlord brought an action for default on a lease against the original tenant on the lease. The original tenant had operated a restaurant, but obtained a buyer to purchase the restaurant and take over its lease. *Renaissance* at ¶ 6. Following the sale, the landlord entered into a new lease agreement, which included the balance of the original lease, with the second tenant. *Id*. at ¶ 7, 13. The second tenant defaulted on the lease and abandoned the premises. *Id.* at ¶ 8. The landlord entered into another lease with a third tenant (an entity

owned by the principal of the defaulting second tenant), and the third tenant promptly defaulted on the lease as well. *Id*. at ¶ 8-9. The landlord attempted to recover against the original tenant for the amounts due for rent through the end of the term of the original lease. *Id*. at ¶ 11. The court determined that the original tenant's obligation to the landlord under the original lease was extinguished when the landlord entered a new lease, "the effect of which [wa]s to terminate the former landlord-tenant relationship and to put an end to the old lease." *Id*. at ¶ 27

{¶28} The law supplied by Hurst, and relied on by the trial court, does not inform the present situation where the issue concerns *Hurst's obligation to Presper under the termination agreement*, but not any obligation to the landlord on the lease itself. Here, there is no issue regarding Hurst's landlord-tenant relationship, nor his liability to the landlord for any default on the lease. The question is whether Hurst remains obligated to Presper to perform on his agreement to pay half of the rent due under the Millennial Group lease, to the extent that rent is now due under the Presper Lease. The answer to that question depends on whether there has been a termination of the lease as contemplated by the parties' termination agreement.

{¶29} Despite the trial court's finding to the contrary, there remains a question as to what the parties intended when they included in the termination agreement the phrase "termination of the Lease[.]" Hurst has asserted that means virtually anything that would cause the Millennial Group Lease to end, regardless of whether the underlying obligation continued to exist. At a minimum, Presper evinced a contrary understanding as to what constituted "termination of the Lease" sufficient to end Hurst's obligation.

{¶30} Through his brief in opposition to the motion for summary judgment, Presper asserted that Section 4 of the termination agreement was intended to resolve the issue of the parties' joint obligations for the remaining term of the Millennial Group Lease. Presper

demonstrated that, per the termination agreement, the parties understood that Presper would remain in Suite 2552, and that Hurst would "continue to pay one-half of the remaining monthly rent due under the [Millennial Group] Lease[.]"  The source of Hurst's obligation to Presper is the termination agreement, not the Millennial Group Lease.  Presper acknowledged that Hurst's obligation would end upon the "termination" of the lease but asserts that—because the parties were aware that the lease could not remain in the name of Millennial Group after it ceased to exist, and because the parties agreed that Presper and his company would occupy the suite—the parties could not have intended that the assumption of the Millennial Group Lease obligations by Presper, or his company, would constitute such a termination.  Thus, he sufficiently raised an issue as to whether Hurst's understanding of the phrase "termination of the Lease" is plausibly consistent with the purpose of the termination agreement.

{¶31}  Based on the foregoing, we conclude that the trial court erred when it granted summary judgment upon an erroneous application of law, and without engaging in the requisite examination and interpretation of the termination agreement.

{¶32}  Regarding Hurst's alternative argument—that his obligation to pay half of the rent ended once Presper caused an extension of the rental period—we note that it is unclear whether the trial court considered this argument directly.  However, the trial court did find that Presper "caused the lease to be extended by executing a new lease with a new termination date of October 31, 2020."  The actual language of the termination agreement stated that "Presper may not cause the Company to extend the term of the Lease."  Thus, based on a plain reading of this language, "Presper may not cause [Millennial Group] to extend the term of the Lease."  There remain questions as to whether Presper actually caused any extension of the lease.  Those issues aside, even if it could be established that Presper could, and in fact did, *cause Millennial Group*

to extend the term of the lease, it is unclear what effect that would have on Hurst's obligation to pay one half of the rent. Although such an action is prohibited by the termination agreement, it is not included among the four stated bases or conditions for concluding Hurst's obligation to pay half of the rent.

{¶33} The trial court erred by entering summary judgment on the basis stated in its decision. Therefore, Presper's assignment of error is sustained.

## III.

{¶34} Presper's sole assignment of error is sustained. The decision of the Summit County Court of Common Pleas is reversed, and this matter is remanded for proceedings consistent with this opinion.

Judgment reversed,
And cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

                                                    _____

                                                    JULIE A. SCHAFER
                                                  FOR THE COURT

CARR, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

ORVILLE L. REED, II, Attorney at Law, for Appellant.

MICHAEL MATASICH, Attorney at Law, for Appellee.